25CA1527 Peo in Interest of FSRS-S 07-09-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1527
Montrose County District Court No. 22JV30011
Honorable Valerie J. Robison, Judge

The People of the State of Colorado,

Appellee,

In the Interest of F.S.R.S-S., a Child,

and Concerning N.S. and R.S.,

Appellants.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE TOW
Harris and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 9, 2026

Julie R. Andress, County Attorney, Ryan J. Dunn, Assistant County Attorney, Montrose, Colorado, for Appellee

Robert G. Tweedell, Guardian Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant N.S.

James West, Office of Respondent Parents' Counsel, Longmont, Colorado, for Appellant R.S.

¶ 1    N.S. (mother) and R.S. (father) appeal the judgment terminating their parent-child legal relationships with F.S.R.S-S. (the child).  We affirm.

## I.    Background

¶ 2    In May 2022, the Department filed a petition in dependency and neglect regarding the then-newborn child based on concerns about mother's and father's substance use, criminal histories, and living environment.

¶ 3    Following the parents' admissions that, through their actions or omissions, the child lacked proper parental care, the juvenile court adjudicated the child dependent and neglected and adopted treatment plans for the parents.  Acknowledging father's argument that his incarceration impeded his ability to accomplish some of his treatment plan objectives, the court ordered father to complete the objectives available to him while in custody.  The court also noted that if father remained in custody his treatment plan could be amended.

¶ 4    More than two years after filing the petition, the Department moved to terminate mother's and father's parent-child legal relationships with the child.  After a nine-day hearing spanning five

months, the juvenile court granted the Department's motion and terminated mother's and father's parental rights.

## II.     Termination of Parental Rights

### A.     Termination Criteria and Standard of Review

¶ 5     The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 6     Whether the juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15; *see also People in Interest of A.S.L.*, 2022 COA 146, ¶ 8 (applying the same standard of review to whether a department of human services satisfied its obligation to make reasonable efforts). We review the court's factual findings for clear error, but we review de novo its legal conclusions based on those findings. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

¶ 7    Relying on *People in Interest of C.A.K.*, 652 P.2d 603 (Colo. 1982), the Department and the child's guardian ad litem (GAL) assert that we review the juvenile court's reasonable efforts determination for clear error.  This argument misstates the holding of *C.A.K.*, in which the supreme court was reviewing not a reasonable efforts determination but, rather, the juvenile court's determination concerning whether the parent in that case had a "mental deficiency and whether that deficiency was of such duration and nature as to render her unlikely, with a reasonable time, to care for the physical, mental, and emotional needs" of her child.  *Id.* at 613.  Instead, we review de novo the juvenile court's assessment of whether the Department satisfied its reasonable efforts obligation.  *A.S.L.*, ¶ 8.

### B.    Appropriate Treatment Plan

¶ 8    Father asserts that the juvenile court erred by finding that his treatment plan was appropriate.  We disagree.

### 1.    Applicable Law

¶ 9    The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required the government's intervention.  *K.D. v.*

*People*, 139 P.3d 695, 699 (Colo. 2006).  A treatment plan is appropriate if it is reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time and relates to the child's needs.  § 19-1-103(12), C.R.S. 2025.

¶ 10     We measure the appropriateness of a treatment plan by its likelihood of success in reuniting the family, "which must be assessed in light of the facts existing at the time of the plan's approval."  *People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005).  As relevant here, a parent's incarceration does not "prohibit the creation and implementation" of an appropriate treatment plan, but it may "render more difficult the crafting of a meaningful and workable plan."  *People in Interest of M.C.C.*, 641 P.2d 306, 309 (Colo. App. 1982) (noting additional considerations for the court, such as the length of the parent's incarceration and nature of the criminal conduct, when approving a treatment plan for an incarcerated parent).

## 2.    Analysis

¶ 11     Father's treatment plan addressed eight areas: parenting time, substance use, stability, parenting education, communication, mental health, criminal activity, and domestic violence.  About six

weeks after the juvenile court adopted father's treatment plan, he was released on bond. But less than two months later, father was arrested again and remained incarcerated through the termination hearing.

¶ 12     Father asserts that because his treatment plan was not amended following his reincarceration and could not be substantially completed during his incarceration, it was "not specifically tailored to [his] particular situation" and, thus, the court erred by finding the treatment plan "reasonable" and "designed to rehabilitate" him.

¶ 13     But father has not asserted that any of the eight main objectives of his treatment plan were unnecessary or that the treatment plan should have addressed something else. *See, e.g., People in Interest of K.B.*, 2016 COA 21, ¶¶ 22-23 (directing the juvenile court to consider, on remand, whether the parent's treatment plan was inappropriate because it did not include a component addressing domestic violence). Indeed, during the dispositional hearing, father's counsel indicated that father agreed to the treatment plan objectives and had already planned to complete many of the objectives. The only change father requested

was the addition of the language "to the effect of as much as [father was] able to complete while incarcerated." In other words, father does not dispute that he needed to address the eight main objectives for him to become a fit parent.

¶ 14 We recognize that father could not complete some of the action steps listed in his treatment plan while he was incarcerated. For example, the treatment plan required father to attend parenting time with appropriate snacks and activities and to maintain employment sufficient to support the home and family. He obviously could not do those things while incarcerated. We disagree with father, however, that this necessarily rendered the treatment plan inappropriate because he has not explained how he could have addressed the safety concerns identified in this case without completing the action steps listed in the treatment plan, nor did he seek amendment of the treatment plan following his release and subsequent reincarceration. Indeed, father does not explain how the treatment plan could have been amended to address his concerns yet still render him a fit parent in a reasonable time. We therefore conclude that the juvenile court did not err by finding that father's treatment plan was appropriate.

## C. Reasonable Efforts

¶ 15    Both father and mother contend that the juvenile court erred by concluding that the Department made reasonable efforts. We disagree.

### 1. Applicable Law

¶ 16    "One of the goals of the Children's Code is to preserve the parent-child relationship whenever possible." *People in Interest of A.A.*, 2020 COA 154, ¶ 5. To that end, before a juvenile court may terminate parental rights under section 19-3-604(1)(c), it must consider the department's reasonable efforts to rehabilitate the parents and reunify the family. *See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2025; *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). As relevant here, "reasonable efforts" means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114).

¶ 17    Services provided in accordance with section 19-3-208, C.R.S. 2025, are generally deemed sufficient to meet the reasonable efforts standard. § 19-1-103(114). Under that statute, services that "must be available and provided" as determined by individual case planning include, among others, screenings, assessments, home-

7

based family and crisis counseling; information and referral services to assistance resources; family time services; and placement services. § 19-3-208(2)(b). Additional services may be required if funding is available, including transportation, childcare, diagnostic and mental health services, drug and alcohol treatment, and family support services. § 19-3-208(2)(d).

¶ 18    A department must provide family time services for parents and children when such services are determined to be necessary and appropriate by individual case plans. § 19-3-208(1), (2)(b)(IV); *B.C.*, 122 P.3d at 1070.  In determining whether and what family time services are necessary and appropriate, the health and safety of the child is paramount. *See B.C.*, 122 P.3d at 1070.  Services, including family time services, should further the purposes of the Children's Code, including the preservation of familial ties whenever possible. § 19-1-102(1)(b), C.R.S. 2025.

¶ 19    In assessing a department's efforts, the juvenile court should consider whether the services provided were sufficient to support the parent's treatment plan, *S.N-V.*, 300 P.3d at 915, by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the

completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33. After a treatment plan is adopted, a department "is obligated to provide the services envisioned in the plan." *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 37.

### 2. Additional Background

¶ 20 As noted, father was reincarcerated about three months after the court adopted his treatment plan. At that time, mother was also arrested and incarcerated. Mother and father agreed to limit their parenting time to one twenty-minute video visit per week while they were incarcerated. Nearly six months later, in July 2023, mother was released on probation, but father was sentenced to the Department of Corrections (DOC) where he remained through the termination hearing.

¶ 21 After mother's release, her in-person supervised parenting time resumed, and she gave birth to the child's sibling, G.S., who remained in her care. By the fall of 2023, mother's parenting time had increased to unsupervised community visits. But following G.S.'s death in November 2023, the Department restricted mother's parenting time back to supervised visits. Once the Department

confirmed the accidental nature of G.S.'s death, mother resumed unsupervised parenting time, which continued to increase in length and frequency until the Department agreed to return the child home to mother on a trial basis on July 1, 2024.

¶ 22     That same day, before returning the child to mother's care, the Department took the child for a hair follicle test. Eleven days later, the Department again removed the child from mother's care after receiving the child's test result, which was positive for methamphetamine. The Department then requested, and the juvenile court granted, a restriction of mother's parenting time to supervised visits. During the last year of the case, mother's parenting time increased from four hours to six hours per week, but it remained supervised.

### 3.     Father's Contentions

¶ 23     Father first asserts that the Department did not make reasonable efforts because it did not provide him with parenting time for approximately one year during the case. The caseworker acknowledged that father did not have parenting time for the majority of 2024. But the caseworker detailed his efforts to establish parenting time for father, including multiple

communications with the incarceration facility, and the barriers that he faced. Specifically, the facility did not allow father to have in-person visits with the child, and it did not have the technology for video visits until late-summer 2024. And once the facility had video visit capability, it did not respond to the caseworker's communications to set up father's visits. Consequently, the caseworker enlisted the help of a parenting time supervision facility, which established parenting time for father beginning December 2024.

¶ 24      In sum, the record indicates that the Department attempted to provide father with parenting time services throughout the case, and any lack of parenting time was attributable to the facility's nonresponsive communication and technological limitations. *See* § 19-3-507(1)(f)(I)(B), C.R.S. 2025 (requiring a department, as part of its reasonable efforts obligation for incarcerated parents, to "communicate with the facility or jail regarding the facility's or jail's ability to facilitate family time between the child and parent through audio-visual communication technology and arrange for *available* virtual family time" if in-person family time is not "reasonably practicable" (emphasis added)).

¶ 25    To the extent father contends that the juvenile court's restriction of mother's parenting time following the child's positive hair follicle test "wrongly denied" him of parenting time, we are unpersuaded. Father's argument is premised on the assumption that had the juvenile court allowed the child to remain in mother's care, father would have received additional parenting time. In support, father relies on the juvenile court's finding that his parenting time typically occurred during a portion of mother's time. But his reliance on this finding is misplaced because the parents' overlapping visits occurred during mother's periods of supervised parenting time. There is no evidence in the record that father requested or received additional time during mother's unsupervised visits or that the Department or juvenile court authorized mother — as opposed to a professional supervisor — to supervise father's visits.

¶ 26    Father next asserts that the Department did not make reasonable efforts because it did not attempt to find outside service providers or determine if the services available to him during his incarceration met the Department's standards. True, the caseworker did not contact any therapists directly or inquire if any

providers were willing to provide in-person services to father during his incarceration. But the caseworker remained in communication with father's case managers to learn about the services available to father during his incarceration, including substance abuse and mental health treatment. Though father's failure to provide a signed release impeded the caseworker's ability to obtain information about the status of father's mental health treatment, father's case managers confirmed that he engaged in some services during his incarceration at the jail and was on the waitlist for substance abuse treatment while in DOC custody. Father also told the caseworker about his participation in substance use and parenting classes, as well as his therapy waitlist status.

¶ 27    Based on the totality of the circumstances, we discern no error in the juvenile court's conclusion that the Department made reasonable efforts to rehabilitate father and reunite him with the child.

### 4.    Mother's Contentions

¶ 28    Mother asserts that the juvenile court erred by concluding that the Department engaged in reasonable efforts when the Department "did not make any effort to reunify [the] family after the child's hair

follicle test in July of 2024." But, citing section 19-1-115(7), C.R.S. 2025, the Department and GAL assert that the Department was not required to provide reasonable efforts to reunify the family. Under the circumstances presented here, we agree with the Department and GAL.

¶ 29     Section 19-1-115(7) carves out three exceptions to a department's obligation to provide reasonable efforts "to prevent the child's removal from the home or to reunify the child and the family." As relevant here, a department is not required to make such efforts "[w]hen the parental rights of the parent with respect to a sibling of the child have been involuntarily terminated." § 19-1-115(7)(b).

¶ 30     In January 2023, mother's parental rights to four of her older children — the child's half-siblings — were terminated. Therefore, under the plain language of section 19-1-115(7)(b), the Department was not required in this case to provide reasonable efforts to reunify mother and the child. *See Cowen v. People*, 2018 CO 96, ¶ 12 ("[I]f the language in a statute is clear and unambiguous, we give effect to its plain meaning and look no further."). Thus, we discern no

reversible error in the juvenile court's reasonable efforts determination.

¶ 31     We note that our analysis addresses only the argument sufficiently developed on appeal. *See Brubaker v. Colo. Sun*, 2026 CO 18, ¶ 52 (noting that the party presentation principle "holds parties responsible for framing the issues to be resolved and calls upon courts to be neutral arbiters as they consider any matters raised"). Because mother does not develop any argument on the point, we express no opinion about the interplay between section 19-1-115(7) and a department's duty to provide reasonable efforts to rehabilitate a parent or to provide services pursuant to section 19-3-208 to support a parent's treatment plan. *See S.N-V.,* 300 P.3d at 915.

### D.     Fitness

¶ 32     Mother asserts that the juvenile court erred by determining that she was unfit. We disagree.

### 1.     Applicable Law

¶ 33     An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *People in Interest of S.K.*, 2019 COA 36, ¶ 74. Reasonable parental

care requires, at a minimum, that the parent provide nurturing and safe parenting sufficient to meet the child's physical, emotional, and mental health needs and conditions. *Id.* A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness." *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

## 2.    Analysis

¶ 34    Mother's treatment plan required her to (1) attend parenting time; (2) maintain sobriety; (3) complete a substance abuse evaluation, follow all treatment recommendations, and submit to weekly, random drug testing; (4) establish and maintain stable housing and employment; (5) participate in parenting education; (6) maintain contact with the Department; (7) address all criminal cases to conclusion and avoid any new criminal charges; and (8) complete a mental health evaluation and domestic violence victim assessment and follow any recommendations.

¶ 35    The juvenile court found that, although mother had engaged in some aspects of her treatment plan, she remained unable or unwilling to provide nurturing and safe parenting sufficient to meet

16

the child's physical, emotional, and mental health needs. Therefore, the court determined that mother was unfit. In so concluding, the court focused on mother's noncompliance with the substance use and domestic violence objectives of her treatment plan, finding that mother did not maintain sobriety or engage in domestic violence victimization treatment as required. *See id.*

¶ 36 The record supports these findings. During her testimony, mother denied any domestic violence during her relationship with father. But multiple witnesses, including a patrol deputy, the caseworker, and a parenting time supervisor, described a domestic violence incident between mother and father in July 2022, which mother described to them as "pretty scary" because she feared that father "was going to kill her." Even so, mother did not complete the domestic violence victim assessment as required by her treatment plan. And mother's therapist was not aware of any domestic violence between mother and father, testifying that treatment for domestic violence victimization and post-traumatic stress disorder was not the focus of their treatment.

¶ 37 Moreover, mother discounted her prior substance use, acknowledged that she continued to use marijuana "a couple times

17

a week," and refused to accept any responsibility for the Department's involvement with the family. Mother testified that she "didn't know how else [she] could improve her protective capability, because [she was] very protective of [her] children." The caseworker described mother's extensive history with child protective services in multiple states, including periods of progress and treatment plan compliance followed by issues necessitating further departmental intervention. Based on mother's testimony, history, and willingness to submit to drug testing only when and how she chose, the caseworker expressed concern about mother's ability to maintain sobriety. Ultimately, the caseworker opined that, even though mother had completed some components of her treatment plan, she had not sufficiently and successfully complied with the treatment plan as a whole.

¶ 38 Nevertheless, mother alleges that the evidence was insufficient to support the court's finding that she did not fully comply with her treatment plan. True, as mother asserts, she lived in the same home for more than a year, was employed at the time of termination, completed a parenting course, maintained contact with the Department, complied with probation, completed a mental

health evaluation, and engaged in therapy intermittently for more than two years. Moreover, the caseworker testified that he believed mother had complied with the domestic violence victimization component of her treatment plan. And the juvenile court acknowledged that mother had complied with some components of her treatment plan.

¶ 39 But, ultimately, after considering and weighing all the evidence presented, the juvenile court determined that mother had not reasonably complied with her treatment plan and it had not been successful. *See People in Interest of D.L.C.*, 70 P.3d 584, 588 (Colo. App. 2003) ("[P]artial compliance, or even substantial compliance, may not result in a successful plan that renders the parent fit."); *see also A.M.*, ¶ 15 ("The credibility of the witnesses; the sufficiency, probative value, and weight of the evidence; and the inferences and conclusions to be drawn from the evidence are within the discretion of the trial court."). Mother has not convinced us that this determination is incorrect.

¶ 40 Specifically, we are unpersuaded by mother's argument that there was "absolutely no evidence" to support the juvenile court's finding that the child's exposure to methamphetamine occurred

19

while she was in mother's care. A caseworker for the Department testified that in June 2024 — a period when the child had extensive unsupervised family time with mother, including consecutive overnights — an individual observed mother's older daughter, who had a history of methamphetamine use, in mother's home. And the permanency caseworker testified that the child's positive hair follicle test was part of mother's demonstrated pattern of exposing her children to illicit substances by continuing to associate with substance users. Therefore, the caseworker expressed concern that mother had not demonstrated the ability to ensure the "ongoing safety of the child in the home." In contrast, he did not have concerns that the foster parents used, or associated with individuals who used, illicit substances.

¶ 41    Even so, mother argues that, because "the evidence presented never established whether the child was exposed to illegal methamphetamine or medication," the court could not determine "by clear and convincing evidence that the exposure occurred while the child was in [her] care." To be sure, a joint witness, testifying as an expert in toxicology and drug analysis, explained that some prescription drugs and nasal decongestants metabolize into

20

methamphetamine. But there was no evidence that the child took any of the specifically identified medications during the hair follicle test's lookback period. And because the juvenile court's finding has record support, we have no basis to disturb it. *See S.Z.S.*, ¶ 29.

¶ 42 Moreover, irrespective of the hair follicle test, the court found, with record support, that mother minimized her past substance use, continued to "imbibe in substances," lacked protective capacity, minimized the child's medical needs, and did not acknowledge the impact her decisions had on the child. *See People in Interest of A.J.L.*, 243 P.3d 244, 251 (Colo. 2010) ("A parent's refusal to acknowledge the impact of her prior behavior on her children may prevent that parent from providing reasonable parental care."). And these findings are sufficient to support the court's conclusion that mother was unfit.

¶ 43 For these reasons, we discern no error.

## E. Less Drastic Alternatives

¶ 44 Father and mother contend that the juvenile court erred by finding that there was no less drastic alternative to termination. We disagree.

21

## 1.    Applicable Law

¶ 45    Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives. *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986).  In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3).  To aid the court in determining whether there is a less drastic alternative to termination, the department must evaluate a reasonable number of persons identified by the parent as placement options. *People in Interest of D.B-J.*, 89 P.3d 530, 532 (Colo. App. 2004).

¶ 46    A viable less drastic alternative must do more than adequately meet a child's needs; rather, it must be in the child's best interests. *A.M.*, ¶ 27.  Hence, if the court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32.  We must affirm the court's determination of whether there is a less drastic alternative if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## 2. Analysis

¶ 47 The juvenile court determined that there was no less drastic alternative to termination that would meet the physical, emotional, and mental health needs of the child and that termination was in the child's best interests. In so finding, the court considered the length of time the case had been pending, the duration of the child's out-of-home placement, and the child's need for permanency and stability. The court acknowledged that alternatives to termination existed — specifically guardianship or an allocation of parental responsibilities (APR) — but found that the proposed alternatives were not best for the child. *See A.M.*, ¶ 32.

¶ 48 The record supports the court's findings. The caseworker opined that, based on the nearly three-year-long Expedited Permanency Planning case and the child's age and attachment issues, it was important for her to have a permanent placement. Moreover, the child's therapist's supervisor, testifying as an expert in the area of childhood trauma and play therapy, described the child's aggressive and hyperreactive behavior during therapy sessions as a sign of trauma. And based on the child's intense

separation anxiety, she opined that the child needed a consistent, calm, stable, and permanent environment.

### a. Father's Contentions

¶ 49 Nevertheless, father asserts that the juvenile court erred by basing its finding that there was no less drastic alternative on two improper assumptions: (1) that an APR would "necessarily have either parent assuming some parental responsibilities" and (2) that an APR is inherently unstable. But father's assertions are belied by the record.

¶ 50 First, the court did not base its rejection of an APR on the fact, or assumption, that it would require the parents to retain some parental responsibilities. The court merely cited applicable law, including *D.P.* in which a division of this court concluded that "[p]ermanently placing the child with a family member or placing the child in a foster home while allowing the parent to assume some parental responsibilities are not viable alternatives to termination if the child needs a stable, permanent home that can be assured only by adoption." 181 P.3d at 408. Father's proposal — that the court "could have . . . crafted [an APR] that allowed the caretaker to determine when, and if, the parents and child were ready to resume

24

some type of relationship" — would have resulted in an erroneous delegation of parenting time decisions to the caregiver and, thus, was not a viable less drastic alternative. *See B.C.*, 122 P.3d at 1070-71 (a court must make decisions about parenting time and may not delegate this function to others).

¶ 51 Second, father provides no record support for his contention that the juvenile court based its denial of an APR on the assumption that APRs are "inherently unstable." Rather, as discussed above, the court considered specific less drastic alternatives to termination before rejecting them as not in the child's best interests based on her particular physical, mental, and emotional needs. *A.M.*, ¶ 32.

¶ 52 Finally, to the extent father asserts that, before rejecting an APR as a less drastic alternative, a court must "consider an actual draft [of an] APR," he does not provide any authority for this proposition. And we are not aware of any.

### b. Mother's Contention

¶ 53 Mother asserts that the Department "refused to look into placement with any relative interested in [an] allocation of parental

responsibilities." But, like father's argument, this contention is belied by the record.

¶ 54 The caseworker testified that he contacted eleven individuals regarding placement, including the child's paternal aunts, maternal grandmother, paternal grandfather, great-grandmother, cousins, and family friends. The caseworker discussed the possibility of an APR with several of these individuals and pursued evaluations of two of the individuals under the Interstate Compact on the Placement of Children. *See D.B-J.*, 89 P.3d at 532.

¶ 55 Even so, mother asserts that the Department failed to pursue placement with relatives willing to accept an APR. But this argument overlooks the juvenile court's finding that an APR, in general, was not in the child's best interests. In other words, even if the Department had further explored placement with relatives willing to accept an APR, the court found, with record support, that an APR was not the best option for the child. *See A.M.*, ¶ 32.

¶ 56 In sum, because the record supports the court's finding that there was no less drastic alternative that would serve the child's best interests, we cannot disturb it. *See B.H.*, ¶ 80.

### III.   Due Process

¶ 57     Father contends that the juvenile court's failure to consider his written closing argument,[1] and this court's denial of his request for a limited remand to allow the juvenile court to rule on a motion to accept his late-filed closing, deprived him of due process. We are not persuaded.

### A.   Applicable Law and Standard of Review

¶ 58     Because "[p]arents have a constitutionally protected liberty interest in the care, custody, and management of their children," *A.M.*, ¶ 17, termination of the parent-child legal relationship must satisfy due process by providing "fundamentally fair procedures," *People in Interest of J.G.*, 2016 CO 39, ¶ 20 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982)). "Under this principle, a parent must be provided with 'notice of the allegations in the termination motion, the opportunity to be heard, the opportunity to have counsel if indigent, and the opportunity to call witnesses and

---

[1] As we discuss more fully below, *infra* Part IV.B., father elected to proceed pro se midway through the termination hearing. As a result, he filed his written closing argument pro se.

engage in cross examination.'" *People in Interest of E.B.*, 2022 CO 55, ¶ 16 (quoting *A.M.*, ¶ 18).

¶ 59 We review procedural due process claims de novo. *People in Interest of R.J.B.*, 2021 COA 4, ¶ 26. But a parent may not obtain relief on a due process claim absent a showing of harm or prejudice. *People in Interest of J.A.S.*, 160 P.3d 257, 262 (Colo. App. 2007).

### B. Additional Background

¶ 60 On the last day of the termination hearing, the juvenile court ordered the parties to file written closings by July 11, 2025. In its termination order, issued eleven days after the deadline, the court noted that father's closing argument had not yet been received. Three months later (and over two months after filing his notice of appeal), father moved this court to remand the case to the juvenile court on a limited basis to allow the court to "make factual findings, accept or reject the late filing, and — if the juvenile court [were to decide] to accept the filing — issue a revised final order." This court denied father's motion.

### C. Analysis

¶ 61 Father asserts that the "lack of opportunity to have his closing considered" deprived him of the opportunity to be heard and,

28

thereby, deprived him of due process. But father had the opportunity to be heard. He was present in court when the deadline was given and did not request additional time to complete and file his closing argument. Furthermore, he was on notice by August 13, 2025, at the latest, that the juvenile court had not received his closing argument, because on that date his counsel filed his notice of appeal and attached the juvenile court's termination order. And yet, father waited an additional two months to request a limited remand. Father cites no authority in support of his implied assertion that a court must grant a party's markedly delayed filings in order to protect their due process rights. And we are aware of none.

¶ 62 Additionally, even assuming, without deciding, that the fact that the juvenile court did not consider his late filing implicated father's due process rights, he has not shown that he was prejudiced as a result. *See id.*

¶ 63 Father's only claim of prejudice is that disallowing consideration of his closing argument "throws into question the standard of review in this [c]ourt." In support, father references that in his closing he argued that there was a less drastic

alternative, namely, an APR to a family member. But, as detailed above, even without father's closing argument the juvenile court specifically considered, and rejected, the alternative of an APR to a family member. And to the extent father asserts that he could not preserve this issue without acceptance of his closing argument, the record reflects sufficient preservation. Thus, "we are unable to discern that the termination proceedings would have been affected in any appreciable way" by the acceptance and consideration of father's late-filed closing argument. *E.B.*, ¶ 22 (citing *People in Interest of C.G.*, 885 P.2d 355, 358 (Colo. App. 1994)).

¶ 64    Based on the record and lack of prejudice, we discern no violation of father's due process rights.

## IV.    Ineffective Assistance of Counsel

¶ 65    Father also contends that he received ineffective assistance of counsel during the shelter hearing, the adjudicatory proceedings, and leading up to and during the termination hearing. We disagree.

### A.    Applicable Law

¶ 66    A parent has a statutory right to effective counsel in dependency and neglect proceedings. §§ 19-1-105(2), 19-3-202(1), C.R.S. 2025; *A.R. v. D.R.*, 2020 CO 10, ¶ 47. A parent can raise a

claim of ineffective assistance of counsel in a dependency and neglect proceeding for the first time on appeal. *People in Interest of C.H.*, 166 P.3d 288, 291 (Colo. App. 2007). However, in an appeal from a judgment terminating parental rights, an appellate court may consider a claim of ineffective assistance of counsel based on counsel's performance at the prior adjudicatory hearing "only when the party asserting the claimed ineffective assistance did not have a full and fair opportunity to bring such a claim immediately after his or her child was adjudicated dependent and neglected (as, for example, by way of a direct appeal of the adjudication order)." *A.R.*, ¶ 85; *see also* § 19-1-109(2)(c), C.R.S. 2025 (stating that an order adjudicating a child dependent or neglected is a final and appealable upon entry of the initial dispositional order). Thus, a parent's assertion of ineffective assistance of counsel based on counsel's performance at the adjudicatory hearing is untimely if raised following the termination of parental rights if (1) the parent was aware (or reasonably should have been aware) of the facts giving rise to any claim of ineffective assistance at the adjudicatory hearing at or shortly after that hearing; (2) the parent made no effort to file a timely appeal from the adjudication order; and (3) the

31

record does not disclose any factual or legal impediments to the parent's ability to pursue a timely appeal. *See A.R.*, ¶ 43.

¶ 67 We employ the same *Strickland* test that is used in criminal cases to evaluate ineffective assistance of counsel claims in dependency and neglect proceedings. *Id.* at ¶¶ 48, 60 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Under this test, to establish a claim, the parent must show that (1) counsel's performance was outside the wide range of professionally competent assistance, and (2) the parent was prejudiced by counsel's deficient performance — that is, there is a reasonable probability that but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *Id.*

¶ 68 If the parent's allegations lack sufficient specificity, we may summarily deny the ineffective assistance claim. *See C.H.*, 166 P.3d at 291. In other words, a remand for an evidentiary hearing is only required if the parent's allegations are sufficiently specific and compelling to constitute a prima facie showing of ineffective assistance of counsel. *Id.*

### B. Additional Background

¶ 69     On the same day that the Department filed the petition in dependency or neglect, the juvenile court appointed counsel for father. After the fourth day of the termination hearing, father's counsel moved to withdraw at father's request. Following a hearing on the motion, the court concluded that father had not asserted a "well-founded reason" to believe that his counsel could not, or would not, competently represent him. Considering the length of the case, the pending termination hearing, and counsel's competent representation of father, the court found that appointing alternate counsel for father was not appropriate. Father then elected to proceed without counsel, at which point the court advised him and determined that he voluntarily waived his statutory right to counsel. Father proceeded pro se for the remainder of the termination hearing.

### C. Father's Contentions of Ineffectiveness

#### 1. Advocacy for the Child's Return Home

¶ 70     Father contends that his trial counsel provided ineffective assistance because he did not file a motion for the child's return home at the beginning of the case. But the record reveals that

father's counsel made this request orally during the shelter hearing. And, following a hearing during which father's counsel presented evidence, attempted to call father as a witness,[2] and engaged in cross-examination of adverse witnesses, the court denied the request as not in the child's best interests.

¶ 71     Father does not suggest how the filing of a written motion, as opposed to making an oral request, would have changed the proceeding's outcome.  Therefore, we conclude that father has not raised a sufficiently specific or compelling allegation to constitute a prima facie showing of ineffective assistance of counsel as it relates to pursuit of a request for the child's return home.

### 2.     Adjudication Advisement

¶ 72     We reject as untimely father's contention that his counsel failed to properly advise him of the consequences of making an admission that the child was dependent or neglected.  *See A.R.*, ¶ 43.

---

[2] When father's counsel called father to testify, father said, "Yeah, I got nothing to say and it's pretty much been said."  After a follow up question from the court, father made it clear that he had no interest in testifying at the hearing.

¶ 73     Father claims that he could not have pursued this issue sooner because he did not learn that he had admitted that the child was dependent or neglected until he read the termination order. But even assuming, as father asserts, that his counsel never "advised [him] as to the content and consequences" of his written admission, the written admission itself, signed by father, specifically stated that he "underst[oo]d that [the] child [would] be adjudicated to be dependent and neglected, and that [the] jury trial . . . [would] be vacated." Moreover, the juvenile court advised father that he had the right to admit or deny the allegations in the Department's petition and, if he admitted the allegations, a judgment of adjudication would enter.

¶ 74     Based on this record, we are not persuaded by father's contention that he was unable to file a timely appeal from the adjudication order. And, therefore, this contention is not properly before us for review. *See id.* at ¶ 85.

### 3. Provision of Documents and Termination Hearing Representation

¶ 75     Father next contends that his trial counsel was ineffective because he "failed to provide [father] with even one piece of paper

35

from motions and orders to discovery" and "was unsatisfactory" in his representation of father during the termination hearing.

¶ 76 First, father raised these concerns during the hearing to resolve his counsel's motion to withdraw. And the court (1) found that father's counsel competently represented him during the four days of the termination hearing preceding his withdrawal; and (2) was not convinced that father's counsel failed to provide father with documentation. Even if father's claims were sufficiently specific or compelling to establish a prima facie claim that his counsel's performance was outside the wide range of professionally competent assistance, the only remedy would be to remand the matter to the juvenile court for an evidentiary hearing. *See C.H.*, 166 P.3d at 291. But the juvenile court already held a hearing and resolved father's allegations. Thus, we need not remand the case to the juvenile court.

¶ 77 Second, father fails to allege with any specificity how he believes his trial counsel failed to adequately represent him during the termination hearing. Father states only that his counsel "was unsatisfactory during the portion of the termination when he represented [f]ather" and "refus[ed] to mount a satisfactory

defense." But those generalized, conclusory allegations alone are insufficient to establish a prima facie claim of ineffective assistance of counsel. *See id.* ("A remand is required only if the parent's allegations are sufficiently specific and compelling to constitute a prima facie showing of ineffective assistance of counsel.").

¶ 78 Third, even if we assume, without deciding, that counsel failed to provide documentation to father, and that such failure fell below the range of professionally competent assistance, father has failed to sufficiently allege any prejudice. Following counsel's withdrawal, the court continued the termination hearing so that the Department could provide necessary documentation to father. And before resuming the termination hearing the court confirmed that father received the documentation he believed necessary to prepare for the hearing. Father does not explain how his earlier receipt of any documentation would have impacted the ultimate outcome of the case.

¶ 79 Nevertheless, father asserts that we should conclude that he was "presumptively prejudiced." "In the criminal context, the Supreme Court has observed that a court may presume prejudice if counsel '*entirely* fails to subject the prosecution's case to

*meaningful* adversarial testing.'" *A.R.*, ¶ 66 (quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984)). The Colorado Supreme Court has held that the presumed prejudice standard should also apply to terminations of parental rights. *Id.* However, the "presumption of prejudice applies only in relatively narrow circumstances." *Id.*; *see also Ybanez v. People*, 2018 CO 16, ¶ 25 (noting that the United States Supreme Court has previously presumed prejudice "only [in] a few narrow circumstances," namely, "where counsel was not made available, was prohibited by the trial court from participating in a critical aspect of the proceeding, or acted under a conflict of interest").

¶ 80 Father does not detail how his counsel "fail[ed] to subject the case to serious adversarial testing." And the court made counsel available to father, did not prohibit his counsel from participating in any aspect of the proceeding, and his counsel was not acting under a conflict of interest. Therefore, we conclude that the presumptive prejudice standard does not apply to father's claims.

## D.    Conclusion

¶ 81    Because father has not alleged a sufficiently specific or compelling allegation, his claims of ineffective assistance must fail. *See A.R.*, ¶ 60.

## V.    Disposition

¶ 82    The judgment is affirmed.

JUDGE HARRIS and JUDGE BROWN concur.